UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Soscia Holdings, LLC

    v.

                                    Civil No. 22-cv-266-LM-AKJ
                                    Opinion No. 2024 DNH 021 P

Terrence Gray, Director of the
Rhode Island Department of
Environmental Management,
And David E. Chopy, Administrator
For the Rhode Island Department of
Environmental Management,
Office of Compliance and Inspection

## O R D E R

Plaintiff Soscia Holdings, LLC ("Soscia") brings this action alleging violations of federal and state law against defendants Terrence Gray, the Director of the Rhode Island Department of Environmental Management ("the Department"), and David Chopy, the Administrator of the Department's Office of Compliance and Inspection. Soscia challenges defendants' enforcement of Rhode Island General Laws § 46-19.1-1 ("the Permitting Act") with respect to Soscia's ownership and operation of the Flat River Reservoir Dam ("the Dam") and Johnson's Pond in the Town of Coventry, Rhode Island. Presently before the court is defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). See doc. no. 57. For the following reasons, the court grants defendants' motion.

## STANDARD OF REVIEW

Under Rule 12(b)(6), the court must accept the well-pled factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and

"determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 68, 71 (1st Cir. 2014) (quotation omitted). The court "isolates and ignores" conclusory and speculative factual allegations in the complaint, as well as "legal labels and conclusions." Sonoiki v. Harvard Univ., 37 F.4th 691, 703 (1st Cir. 2022) (brackets and quotation omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In addition to the well-pled factual allegations in the complaint, the court may consider exhibits submitted with the complaint or referred to in the complaint, official public records, documents central to the plaintiff's claim, and documents the authenticity of which is not disputed. See Newman v. Lehman Bros. Holdings, Inc., 901 F.3d 19, 25 (1st Cir. 2018).

## BACKGROUND

The fourth amended complaint (doc. no. 51) is the operative complaint in this case. The following facts are taken from doc. no. 51 as well as documents attached to the complaint[1] and documents in the record that are central to Soscia's claims.

---

[1] The fourth amended complaint often refers to exhibits it states are "attached hereto." E.g., doc. no. 51 ¶ 7. However, no documents are attached to doc. no. 51. Soscia did submit several exhibits alongside its proposed amended complaint, however. See doc. nos. 45-47. It appears Soscia intended to attach these exhibits to the fourth amended complaint but inadvertently failed to do so. The court therefore considers the exhibits in doc. nos. 45-47 in ruling on defendants' motion to dismiss.

In 1846, the Rhode Island General Assembly enacted legislation entitled "An Act To [I]ncorporate the Quidnick Reservoir Company" ("the 1846 Act"). Doc. no. 45 at 24-25. The 1846 Act established Quidnick as "a body corporate and politic" whose purpose was "erecting, establishing, maintaining and keeping in order dams and reservoirs on the waters of the said Pawtuxet River and its branches." Id. at 24. The 1846 Act granted Quidnick the power to own property "not exceeding twenty thousand dollars," to "grant, sell, demise, and dispose of" property, to sue and be sued, to use a seal, to establish by-laws for corporate governance "not being contrary to the laws of this State or of the United States," and "generally to do, execute and perform, all and singular acts, matters and things which to them it shall or may appertain to do." Id. Following incorporation, Quidnick erected dams on the Pawtuxet River and its branches to service various mills of Quidnick's members, including the Dam that is at issue in this case. The Dam's construction created Johnson's Pond.

The Rhode Island legislature amended the 1846 Act in 1867, 1975, and 1982. The 1982 Act repealed and "amended [the 1846 Act] in its entirety." Doc. no. 45 at 35; see also id. at 39 (providing that "all acts and parts of acts inconsistent herewith are hereby repealed"). At Quidnick's request, the 1982 Act relieved Quidnick of its status as a body politic and made it a private corporation. See id. at 35-39; see also doc. no. 63 at 15. The 1982 Act set forth Quidnick's purpose: "to erect and establish dams and reservoirs for the retention and preservation of the waters of the Pawtuxet River and its branches for the benefit of its members; for establishment

and operation of hydro power sites for its members' uses and resale of power generated therefrom; and any other legal purpose." Doc. no. 45 at 35-36. While the 1982 Act set forth Quidnick's powers, it also stated that it did not "invalidate any action" Quidnick had previously taken. Id. at 39; see id. at 35-37.

On January 1, 2009, Quidnick leased Johnson's Pond and 80 acres of open space to the Town of Coventry ("the Coventry Lease" or "the Lease").[2] See doc. no. 46 at 2-18. The Lease required Coventry to maintain and repair the Dam, id. at 8, but Soscia retained the right to operate and maintain the control gates on the Dam and the right to regulate and maintain the water level in the Pond, id. at 10. The Lease required Quidnick to "endeavor to maintain the water level elevation at Johnson's Pond . . . in accordance with the 'Water Level Table'" included in the Lease. Id. The Water Level Table sets waterflow rates and water elevation rates for Johnson's Pond during certain periods of each year. Id. at 11. For the period during the year between June 1 and September 30, the Water Level Table required Quidnick to "use its best efforts to maintain water level elevation at spillway level." Id. The Lease is set to expire on March 31, 2024. Id. at 2.

Soscia purchased the Dam, Johnson's Pond, and related property from Quidnick in March 2020 by quitclaim deed and has provided the court with copies of the purchase and sale agreement, deed, and mortgage. See doc. no. 45 at 2-13

---

[2] It is not clear whether Quidnick previously leased the Pond to Coventry.

(agreement and deed); doc. no. 32-2[3] (mortgage). The deed conveyed to Soscia "[a]ll right, title and interest" held by Quidnick with respect to Johnson's Pond, including

> all the right, title, claim and interest that Quidnick . . . has in and to any and all land in the Town of Coventry, and any and all rights, title, claims and interest that Quidnick . . . has in the waters or submerged lands within the Town of Coventry, including but not limited to the Flat River Reservoir and Johnson's Pond, and all flowage rights, dams, flumes, raceway and other apparatus or equipment used in connection therewith.

Doc. no. 45 at 9; see id. at 6. In addition, Quidnick assigned its rights and obligations under the Coventry Lease to Soscia. See doc. no. 46 at 51.

The mortgage agreement granted Quidnick a mortgage on the property conveyed to Soscia in the deed. See doc. no. 32-2 at 2. The mortgage agreement requires Soscia to "maintain and control the water elevation in Johnson's Pond . . . in accordance with the Water Level Table" set forth in the Coventry Lease. Id. at 5. In addition, the mortgage agreement requires Soscia to "comply in all material respects with . . . all present and future laws, regulations and other requirements of

---

[3] Soscia attached the mortgage agreement to its second amended complaint. See doc. no. 32-2. For reasons that are not apparent, Soscia did not include the mortgage agreement with the materials it intended to attach to the fourth amended complaint. Because Soscia previously attached the mortgage agreement to its complaint and because it is central to Soscia's claims, the court considers the mortgage agreement. See Newman, 901 F.3d at 25 ("Particularly when 'a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings,' thereby giving the court the discretion to consider such additional material." (quoting Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008))).

every governmental body having jurisdiction over [Johnson's Pond] or the use or occupation of the improvements thereon." Id. at 8.

In 2022, the Rhode Island legislature enacted legislation entitled "An Act Relating to Waters and Navigation – Dam Permits" ("the Permitting Act"). Doc. no. 46 at 65; see R.I. Gen. Laws § 46-19.1-1. The Permitting Act requires owners and operators of dams which can store more than a certain amount of water to apply to the Department "for a permit to raise or lower the water level behind the dam." R.I. Gen. Laws § 46-19.1-1. The dam owner or operator can continue to operate the dam "until such time as a permit is issued," but must do so "in a manner consistent with [the dam's] historic use."[4] Id. The Permitting Act authorizes the Department to "enforce this section in accordance with chapters 17.1 and 17.6 of title 42" and to promulgate implementing regulations. Id. The Permitting Act took effect on June 27, 2022.

On July 11, 2022, the Department sent a letter bearing Chopy's signature to Soscia. See doc. no. 46 at 67-70. The letter notified Soscia of the Permitting Act and stated the Department's belief that the Dam was subject to the Permitting Act and therefore was required to obtain a permit "to raise or lower the water level behind the dam." Id. at 67. The letter also informed Soscia of the historic use to which the Department believed the Dam had been put, which mirrored the requirements of the Water Level Table set forth in the Coventry Lease. Id. at 68-69. The

---

[4] The Permitting Act's implementing regulations define "historic use" as "the use that has consistently occurred in the operation of the dam between July 1971 and June 2022." 250-RICR-130-10-1.5.

6

Department invited "any interested party, including Soscia," to submit information suggesting that the Dam had been historically operated in another manner, which could cause the Department to revise its determination of the Dam's historic use. Id. at 69.

The letter stated that the Department inspected the Dam on June 30, 2022, and July 11, 2022, and determined that the water level in Johnson's Pond was below spillway level, which was inconsistent with the Dam's historic use. The Department informed Soscia that, if Soscia did not operate the Dam consistent with its historic use, the Department would "issue a formal enforcement action" which could entail civil penalties of up to $1,000 per day of noncompliance. Id. at 70.

Two days later, on July 13, 2022, the Department sent Soscia a cease-and-desist letter, ordering Soscia to cease operating the Dam in a manner inconsistent with historic use. See id. at 90. The Department had "determined that the water levels at" Johnson's Pond "are currently at historic lows for this time of year," which "pose[d] a threat to the wetlands surrounding the pond; the habitat, flora and fauna of the pond; and present a threat to recreational uses of the pond, such as fishing, boating, and swimming." Id. at 91. The letter stated that, if Soscia failed to comply, the Department would bring an enforcement action in Rhode Island Superior Court.

On August 9, 2022, the Department sent Soscia an "Immediate Compliance Order," which Gray signed. See doc. no. 47 at 2-5. The Compliance Order stated that the Department had previously identified the presence of five species of freshwater mussels in Johnson's Pond, some of which were "rare and of high

7

conservation priority." Id. at 3. At an inspection of Johnson's Pond on August 1 and 2, 2022, Department biologists confirmed that some of these rare mussels continued to reside in Johnson's Pond, but that "[t]he abnormally low water levels" at the Pond were "adversely affecting the physical, chemical, and biological integrity of the habitat and adversely altering the uses, processes, and activities of fish and wildlife," including the aforementioned rare freshwater mussels. Id. The Compliance Order attributed the abnormally low water levels in the Pond to Soscia maintaining an outflow rate from Johnson's Pond at a rate greater than forty cubic feet per second, which was inconsistent with the Pond's historic use for the summer months. See id. at 3, 10. The Compliance Order directed Soscia to reduce the outflow rate at the Dam to forty cubic feet per second. It further stated that it would be "effective for 45 days after issuance and may be renewed for one additional period of 45 days." Id. at 4.

Shortly before issuance of the Compliance Order, on July 18, 2022, Soscia brought this action in the United States District Court for the District of Rhode Island, challenging defendants' actions as unconstitutional and bringing related state law claims. See doc. no. 1. Soscia also filed a motion for a temporary restraining order and/or preliminary injunction to enjoin defendants from enforcing the Permitting Act. See doc. no. 5. Soscia filed its first amended complaint on July 27, 2022. On July 29, 2022, after the judges in the District of Rhode Island entered orders of recusal, the case was referred to the undersigned judge, who is sitting by designation. See doc. no. 11.

8

Defendants moved to dismiss the first amended complaint. See doc. no. 24. Soscia responded by moving to amend the first amended complaint. See doc. no. 25. The court granted Soscia's motion to amend and denied the motion to dismiss without prejudice. See Endorsed Order, Sept. 13, 2022. Soscia thereafter filed its second amended complaint. See doc. no. 32. Defendants again moved to dismiss. See doc. no. 34. At a hearing on January 24, 2023, the court denied Soscia's motion for a preliminary injunction. On June 15, 2023, the court granted defendants' motion to dismiss in part. See doc. no. 42. The court dismissed Soscia's claims brought against the State of Rhode Island and the Department, a claim brought under the Rhode Island Constitution, as well as Soscia's individual capacity claims against Chopy and Gray. See id. at 1-2. The court declined to dismiss Soscia's federal law claims against Chopy and Gray to the extent they sought only prospective injunctive relief. Having substantially narrowed Soscia's claims, the court permitted defendants to "address the merits of the remaining claims" in a subsequent motion to dismiss or for summary judgment. Id. at 2.

Meanwhile, on June 6, 2023, the Department sent Soscia a letter bearing Chopy's signature notifying Soscia that the Department had promulgated regulations implementing the Permitting Act and providing Soscia with a copy of the regulations. See doc. no. 47 at 53-63. The regulations require Dam owners and operators to apply for a permit "[w]ithin sixty days of the effective date of these rules and regulations." 250-RICR-130-10-1.8.

9

On July 12, 2023, the Department issued Soscia a "Notice of Violation" assessing a civil penalty of $23,000 for failure to comply with the Permitting Act and its implementing regulations. See doc. no. 47 at 75-88. The Notice laid out a process for an administrative appeal of the civil penalty. See id. at 83.

On July 19, 2023, Soscia filed a second motion for a temporary restraining order and/or preliminary injunction to prevent defendants from imposing the civil penalties set forth in the Notice of Violation. See doc. no. 48. At a status conference on July 26, the court directed the parties to meet-and-confer to draft a joint proposal for a preliminary injunction that would preserve the status quo in this case. See doc. no. 50.

On July 28, 2023, Soscia filed the fourth amended complaint. See doc. no. 51. Soscia also filed another motion for emergency injunctive relief because, among other things, the parties had failed to reach agreement on a status quo order. See doc. no. 52. The court then entered a temporary injunction to preserve the status quo while the court resolved Soscia's motions for injunctive relief. See doc. no. 54.[5]

In the fourth amended complaint, Soscia brings six claims for prospective relief against Gray and Chopy in their official capacities.[6] In Count I, Soscia alleges

---

[5] Soscia filed another motion for emergency injunctive relief on September 1, 2023, see doc. no. 56, and a fourth motion for emergency injunctive relief on February 28, 2024. See doc. no. 70. At present, there are four motions for emergency injunctive relief pending in this matter, most of which are duplicative. See doc. nos. 48, 52, 56, 70.

[6] Although the court previously dismissed Soscia's claims against the State of Rhode Island, the Department, and Soscia's claims against Gray and Chopy seeking damages, Soscia has included these claims in its fourth amended complaint.

that the Permitting Act, the July 13, 2022 cease-and-desist letter, and the civil penalties assessed in the Notice of Violation violate the Contracts Clause of the United States Constitution because they substantially impair "Soscia's contract rights it owns and possesses with respect to the State of Rhode Island and the obligations owed by the State of Rhode Island to Soscia." Doc. no. 51 ¶ 45. Soscia alleges that the Rhode Island General Assembly entered into a "franchise contract" with Quidnick, which Quidnick then "transferred to Soscia." Id. ¶ 48. Soscia alleges that the Permitting Act and its implementing regulations "unconstitutionally and substantially impair Soscia's franchise rights and constitute an unreasonable and unnecessary regulation of the State of Rhode Island with respect to the contract rights owned by Soscia and the obligations of the State of Rhode Island due to Soscia pursuant to said contract." Id. ¶ 46.

In Count II, Soscia alleges that the Permitting Act's requirement that Soscia obtain a permit to operate the Dam and defendants' actions to enforce that requirement represent a "taking [of] its franchise rights in violation of the Takings Clause of the United States Constitution." Id. ¶ 55. Soscia alleges that it "purchased from Quidnick" Quidnick's "franchise rights as granted to [Quidnick] pursuant to enactments of the Rhode Island General Assembly." Id. ¶¶ 53-54. Soscia alleges that the Permitting Act is "preventing Soscia from creating dry land and which dry land could be used by Soscia to its economic or other advantage and benefit," and that, if required to "keep its submerged land underwater," Soscia would be

"completely deprive[d] . . . of all economically beneficial use of its property." Id. ¶¶ 55-56.

In Count III, Soscia alleges that the Department's letters from July 2022 violate Soscia's procedural due process rights because defendants "failed to give Soscia an opportunity to comment and/or hearing." Id. ¶ 61. In Count IV, Soscia alleges that defendants violated Soscia's equal protection rights. See id. ¶¶ 63-66. In Counts V and VI, Soscia brings supplemental state law claims for intentional interference with contractual relations (Count V) and "intentional interference with franchise/contractual right" (Count VI).

## DISCUSSION

Defendants now move to dismiss all claims in the fourth amended complaint. See doc. no. 57; see also doc. no. 58 (memorandum of law in support of motion to dismiss). The court will consider whether defendants are entitled to dismissal of each of Soscia's claims count-by-count.

I.    Soscia Has Failed to Adequately Allege a Contracts Clause Claim

In Count I, Soscia alleges that the Permitting Act, the July 13, 2022 cease-and-desist letter, and the civil penalties set forth in the Notice of Violation violate Soscia's rights under the Contracts Clause of the United States Constitution. By its terms, the Contracts Clause prohibits states from passing any "Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10. Despite the Clause's "unequivocal language," United Auto., Aerospace, Agric. Implement Workers of Am. Int'l Union v. Fortuño, 633 F.3d 37, 41 (1st Cir. 2011), it "does not make unlawful every state law

12

that conflicts with any contract," Local Div. 589, Amalgamated Transit Union v. Massachusetts, 666 F.2d 618, 638 (1st Cir. 1981); see also Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente, 125 F.3d 9, 14 (1st Cir. 1997) (explaining that a reviewing court must "reconcile the strictures of the Contract Clause with the essential attributes of sovereign power necessarily reserved by the States to safeguard the welfare of their citizens" (quoting U.S. Tr. Co. of N.Y. v. New Jersey, 431 U.S. 1, 20 (1977))).

"Over time, the Supreme Court has devised a tripartite test for use in analyzing alleged impairments of contracts." McGrath v. R.I. Ret. Bd., 88 F.3d 12, 16 (1st Cir. 1996) (citing Gen. Motors Corp. v. Romein, 503 U.S. 181, 186 (1992)). To establish a Contracts Clause violation, the plaintiff must show: (1) a contract exists; (2) the law substantially impairs an obligation imposed by the contract; and (3) the impairment is not "reasonable and necessary to fulfill an important public purpose."[7] Id. Where the state is a party to the contract, "courts must scrutinize the [law's] asserted purpose with an extra measure of vigilance." Id.

---

[7] This test is sometimes framed as having two prongs rather than three. See United Auto., 633 F.3d at 41 & n.4 ("The first question is whether the state law has operated as a substantial impairment of a contractual relationship. If the contract was substantially impaired, the court next turns to the second question and asks whether the impairment was reasonable and necessary to serve an important government purpose." (quotations, citations, and ellipsis omitted)). There is "no substantive difference between these differing characterizations." Id. at 41 n.4.

A.    Soscia Has Failed to Adequately Allege That It Has a "Franchise" Contract

Soscia alleges that it has a "franchise" contract with the State of Rhode Island, and that defendants have substantially impaired Soscia's rights under this contract. "Generally speaking, a franchise may be defined as a privilege granted by the government to a company or individual to transact a particular kind of business, as in the case of a privilege granted to a waterworks company to supply a municipality with water and to collect water rates for the use of water supplied." CSL Utils., Inc. v. Jennings Water, Inc., 16 F.3d 130, 135 (7th Cir. 1993). "Franchises under state law generally take the form of utilities, or other monopolies, created to further the public interest." 36 Am. Jur. 2d Franchises from Public Entities § 3. A franchise exists when the legislature confers upon a private entity "the right to carry on any business of a public nature, such as the establishment, construction, and operation of a public utility and the collection of tolls or charges for its use or service." Id. A franchise has both a public and a private component: the holder of a franchise exercises the rights granted to it by the state to further the public interest, but it may do so in a manner that also furthers its own "private business." In re R.I. Suburban Ry. Co., 48 A. 591, 592 (R.I. 1901). Once conferred, a franchise constitutes a property interest subject to protection in a manner similar to other property interests. Fed. Auto Body Works, Inc. v. Cianci, No. C.A. 78-1742, 1980 WL 336033, at *2 (R.I. Super. Ct. Feb. 14, 1980).

In the fourth amended complaint, Soscia alleges that "[t]he 1846 Act and the construction of reservoirs and dams by Quidnick constitute a franchise." Doc. no. 51

¶ 16. According to Soscia, the Rhode Island legislature, through the 1846 Act, granted "Quidnick an exclusive franchise to utilize the water rights of the Pawtuxet River and its borders for its purposes for the sole and exclusive benefit of Quidnick's members." Id. ¶ 21. Soscia argues that, following passage of the 1846 Act, the State "no longer had the right to control any matters with respect to the use of the waters behind the . . . Dam and the Johnson's Pond." Doc. no. 63 at 13 (emphasis added). Finally, Soscia argues that Quidnick transferred its franchise to Soscia in the 2020 quitclaim deed.

Soscia's allegations suffer from several flaws. First, even assuming the 1846 Act granted Quidnick a franchise to control all aspects of the use of the waters behind the Dam and Johnson's Pond, the Rhode Island legislature repealed the 1846 Act in 1982 and made Quidnick a private corporation—which, according to Soscia, was done at Quidnick's request. See doc. no. 63 at 15. Soscia does not argue that the 1982 Act granted Quidnick a franchise. Rather, Soscia argues that the 1982 Act did not divest Quidnick of the franchise previously granted by the 1846 Act. Soscia's contentions—which are not subject to deference at the motion to dismiss stage insofar as they turn on the proper interpretation of a piece of legislation, see, e.g., Mancini v. City of Providence, 155 A.3d 159, 161 (R.I. 2017)—are belied by the plain text of the 1982 Act.

The 1982 Act amended and replaced the 1846 Act "in its entirety." Doc. no. 45 at 35. The 1982 Act stated that Quidnick's purpose was to operate "for the benefit of its members"; it states nothing requiring Quidnick to conduct its operations to

advance the public interest. Id.; see id. at 35-39. Soscia seizes on language from the 1982 Act stating that "[n]othing herein . . . shall be construed to invalidate any action heretofore taken by the Quidnick Reservoir Company." Id. at 39. However, to the extent Quidnick possessed a franchise to control all aspects of the water levels behind the Dam and in Johnson's Pond, that right was conferred by action of the Rhode Island legislature, not any action Quidnick took in the exercise of that right. Simply put, while the 1982 Act states that it shall not be construed to invalidate any action previously taken by Quidnick, it is the action of the legislature, not Quidnick, that matters when determining whether Quidnick held a franchise as alleged. See CSL Utils., 16 F.3d at 135.

Even granting Soscia the additional assumption, however, that Quidnick retained any franchise granted by the 1846 Act following the passage of the 1982 Act, Soscia must still plausibly allege that it is now in possession of Quidnick's franchise. Soscia fails to do so.

As noted, Soscia contends that Quidnick transferred its franchise to Soscia in the 2020 quitclaim deed. Nothing in the deed, however, provides that Quidnick transferred a franchise to Soscia. See Yacubian v. United States, 750 F.3d 100, 108 (1st Cir. 2014) ("[I]t is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." (quotation omitted)). The deed conveyed to Soscia "two parcels of land" as those parcels are described in the deed. Doc. no. 45 at 5. The deed identified the first parcel as a 100-acre plot located at 1660 Flat River Road in

Coventry. Id. at 6-9. The second parcel was identified as Quidnick's "[l]and and [w]ater rights" to Johnson's Pond. Id. at 6. Along with Johnson's Pond, the deed conveyed to Soscia Quidnick's right to "cover and flow with water" certain lands as well as "all rights . . . Quidnick . . . has in the waters or submerged lands within the Town of Coventry, including . . . all flowage rights, dams, flumes, raceways, and other apparatus or equipment used in connection therewith." Id. at 9. Nowhere, however, does the deed convey any franchise held by Quidnick to Soscia.[8] Absent a conveyance of Quidnick's purported franchise to Soscia, Soscia does not have a franchise. See Watson v. Knowles, 13 R.I. 639, 641 (1882).

For these reasons, Soscia has failed to plausibly allege that it has a franchise contract with the State of Rhode Island. Because its Contracts Clause claim is premised on the existence of this franchise, that claim fails as a matter of law.

_____

[8] Perhaps in recognition of this, Soscia attempts to rewrite the language of the deed by affidavit. Attached to the fourth amended complaint is an affidavit prepared and signed by Joel Westerman on February 21, 2023—three years after the conveyance of the land and rights within the deed and more than six months after the institution of this action. See doc. no. 45 at 15. Westerman states he is the President of Quidnick and that, on March 2, 2020, Quidnick transferred to Soscia "any and all rights, title, or interest acquired by Quidnick pursuant to [the 1846 Act and its amendments], franchise, statutory or otherwise, which Quidnick owned or possessed in the Town of Coventry at the time of closing." Id. at 15-16. The parol evidence rule, however, forbids Soscia or Westerman from inserting this language into the deed by affidavit three years after the deed's execution. See Paolella v. Radiologic Leasing Assocs., 769 A.2d 596, 599 (R.I. 2001).

B.    <u>Soscia Has Failed to Adequately Allege That Any Impairment Was Unreasonable or Unnecessary to Serve an Important Government Purpose</u>

Even if the court were to find that Soscia had a franchise to exercise unencumbered control over the water levels in Johnson's Pond and that the actions Soscia complains of substantially impaired that right, Soscia's Contracts Clause claim would fail for the additional reason that Soscia has not plausibly alleged that such impairment was unreasonable or unnecessary to serve an important government purpose. <u>See</u> United Auto., 633 F.3d at 42 (affirming dismissal of Contracts Clause claim in <u>Ex parte Young</u> action against Puerto Rican officials for failure to plausibly allege the challenged law was unreasonable or unnecessary; "where plaintiffs sue a state . . . challenging the state's impairment of a contract to which it is a party, the plaintiffs bear the burden on the reasonable/necessary prong"). Under the third prong of a Contracts Clause analysis, "the reasonableness inquiry asks whether the law is reasonable in light of the surrounding circumstances, and the necessity inquiry focuses on whether [the state] imposed a drastic impairment when an evident and more moderate course would serve its purposes equally well." Id. at 45-46 (quotation and brackets omitted). To avoid dismissal of a Contracts Clause claim pursuant to Rule 12(b)(6), "a plaintiff with reason to believe that a state action was unreasonable or unnecessary can, in the complaint, list the state's articulated motive(s), and then plead facts that undermine the credibility of those stated motives or plead facts that question the reasonableness or necessity of the action in advancing the stated goals." Id. at 45.

The fourth amended complaint alleges that the Permitting Act and its implementing regulations "constitute an unreasonable and unnecessary regulation" with respect to Soscia's purported franchise. Doc. no. 51 ¶ 46. This, however, is the sort of conclusory parroting of the elements of a cause of action that the court does not credit at the motion to dismiss stage. See Sonoiki, 37 F.4th at 703. Nowhere in the fourth amended complaint does Soscia make any factual allegations that would tend to show that the Permitting Act, its implementing regulations, or any of the challenged actions in this case were unreasonable or unnecessary to protect an important public interest. See United Auto., 633 F.3d at 45.

Soscia does attach materials pertinent to this inquiry to its fourth amended complaint—specifically, a cost-benefit analysis that the Department completed as a precursor to adopting regulations to implement the Permitting Act. See doc. no. 47 at 68-73. However, the cost-benefit analysis undercuts rather than bolsters the plausibility of Soscia's Contracts Clause claim. Pursuant to that analysis, the Department identified numerous benefits that inure to various segments of the population by operation of the Permitting Act: (1) by securing a permit outlining the permissible uses to which a dam may be put, dam owners and operators gain certainty as to the bounds within which they can operate the dam and gain protection from liability; (2) users of freshwater wetlands behind and below dams gain certainty as to how dams will be operated and can make decisions with respect to the use of such wetlands based on a settled understanding of how those dams will affect wetlands; (3) freshwater wetlands will be protected for species of birds, fish,

19

mammals, and organisms that call those wetlands home; and (4) persons who own property near the dam will gain protection from flood and drought.

In its objection to the defendant's motion to dismiss (but not its complaint), Soscia claims that these are not important public interests because their achievement via the Permitting Act impairs the rights granted to Quidnick in the 1846 Act and subsequently transferred to Soscia. If the achievement of these ends were truly necessary, Soscia contends, the legislature would not have granted Quidnick a franchise to exercise unrestrained control over the water level in Johnson's Pond in 1846. To be sure, in a Contracts Clause analysis, the extent of the impairment of the contractual right informs whether the legislation is a reasonable means to achieve its ends. United Auto., 633 F.3d at 46. But even if this court were to find that Soscia plausibly alleged it possessed a franchise, the fact that the Permitting Act may impair Soscia's rights under its purported franchise does not show that such impairments are unreasonable or unnecessary to achieve important public ends. The court is not persuaded that the possibility the Rhode Island legislature could have acted to further the ends advanced by the Permitting Act in 1846 makes it plausible that the Permitting Act is unreasonable or unnecessary.[9]

---

[9] Furthermore, the court notes that Soscia is incorrect in arguing that the Rhode Island legislature did not act to regulate dams for the public welfare in the years between 1846 and the Permitting Act's passage. Rhode Island passed legislation to regulate and control the operation of dams in 1882 ("the 1882 Act"). See doc. no. 58-1 (1882 Act). The 1882 Act provided for the appointment of a "Commissioner of dams and reservoirs" who "shall make a thorough inspection of

Soscia next argues that the Permitting Act is unnecessary to achieve an important government interest because the qualitative benefits discussed in the cost-benefit analysis are already achieved by existing legislation. Soscia notes that prior legislation enacted by Rhode Island in the 19th Century permitted mill owners to "continue and improve the pond and keep up the dam . . . for [their] advantage, without[] molestation," but permitted "person[s] aggrieved or injured by" a dam's operation to commence an action for damages against the mill owner. Doc. no. 64-3 at 2-3. The possibility of a monetary recovery for damages caused by a mill's operation, however, does not achieve the ends identified in the cost-benefit analysis to the degree that the Permitting Act does, because the Permitting Act allows for specific enforcement of the requirements for a dam's operation set forth in the permit issued by the Department. See R.I. Gen. Laws §§ 46-19.1-1; 42-17.1-2(21); see also 250-RICR-130-10-1.8. A court may enjoin a dam owner or operator's failure to comply with the Permitting Act, thereby requiring that the dam be operated according to the terms of its permit or consistent with its historic use as determined by the Department. See R.I. Gen. Laws §§ 46-19.1-1; 42-17.1-2(21). The availability

---

every dam and reservoir in the state as often as may be necessary" and "report . . . his doings . . . to the governor." Id. at 3-4. The Act required dam owners and operators to cooperate with the Commissioner and provided that "[n]o dam or reservoir shall be constructed or substantially altered" until notifying the Commissioner. Id. at 4. If the Commissioner had "cause to apprehend that any dam or reservoir is unsafe," he was empowered to direct the dam owner or operator to "draw[] off" water in the reservoir or make "alterations, additions and repairs" to the dam. Id. at 4-5. Failure to comply with the Commissioner's directives could result in court enforcement. See id. at 5.

of specific enforcement to require a dam operator to conform the dam's operation to the requirements of its permit constrains the dam's operation to a far greater extent than a post hoc damages action does. Indeed, if damages were the only relief available, nothing would stop a dam owner from determining that the benefit of operating its dam in manner that damaged others' property outweighed the payments it would be required to make for the damages it caused, and carry on operating however it saw fit. Thus, the possibility of a damages action against a dam owner or operator does not demonstrate that the Permitting Act is unnecessary to achieve the qualitative benefits discussed in the cost-benefit analysis.

Soscia also states (again, in its objection to the motion to dismiss and not in its fourth amended complaint) that the cost-benefit analysis failed to determine any quantitative benefits that flow from the Permitting Act. Therefore, Soscia argues, the Permitting Act is unreasonable because there are no objective standards to guide the Department's discretion in issuing permits. Soscia's argument mischaracterizes the cost-benefit analysis. While the cost-benefit analysis does state that it could not determine quantitative benefits of the Department's proposed regulations, this was because any quantitative benefits "will vary depending on the dam, the proposed use and the parties that will be affected by the operation of the dam." Doc. no. 47 at 72. Thus, the cost-benefit analysis does not show that it is impossible to determine objective criteria to guide the Department's discretion in issuing permits under the Act, but rather, that the Department's permitting

22

decisions will be done on a case-by-case basis based on the costs and benefits that are attendant to a particular dam's circumstances.

For these reasons, Soscia has failed to plausibly allege that any impairment of its contract rights is unreasonable or unnecessary to achieve an important government purpose. Soscia's Contracts Clause claim fails for this independent reason as well. Having found that the fourth amended complaint fails to state a Contracts Clause claim, defendants are entitled to dismissal of Count I.

II.    Soscia Has Failed to Adequately Allege a Takings Claim

In Count II, Soscia alleges that defendants' actions pursuant to the Permitting Act and its regulations violate Soscia's rights under the Takings Clause of the United States Constitution. The Takings Clause of the Fifth Amendment to the United States Constitution (applicable to the states via the Fourteenth Amendment) provides that a state may not take "private property . . . for public use, without just compensation." U.S. Const. Amend. V. Defendants contend that they are entitled to dismissal because Soscia's takings claim is not ripe. But even if Soscia's claim is ripe, defendants contend that Soscia fails to state a claim upon which relief can be granted. Because ripeness implicates the court's subject-matter jurisdiction, the court first addresses defendants' ripeness challenge.

A.    Soscia's Takings Claim is Ripe

The doctrine of ripeness flows from Article III's case-or-controversy requirement. See U.S. Const. art. III, § 2; Reddy v. Foster, 845 F.3d 493, 499 (1st Cir. 2017). A claim is not ripe if it is "contingent [on] future events that may not

23

occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (quotation omitted). There are two prongs to a ripeness analysis: "fitness" and "hardship." Reddy, 845 F.3d at 501. Under the fitness prong, there must be "a sufficiently live case or controversy" such that it would be inappropriate to postpone resolution of the dispute. Id. (quotation omitted). Under the hardship prong, the court must assess "the harm to the parties seeking relief that would come to those parties from" failure to resolve their dispute. Id. (quotation omitted).

Here, defendants argue that Soscia's takings claim is not ripe because Soscia may only seek prospective injunctive relief on that claim, the Department has promulgated regulations that may permit Soscia to operate the Dam in a manner inconsistent with historic use, and Soscia has not applied for a permit. Thus, defendants argue, it is uncertain whether the taking of Soscia's property that Soscia alleges will ever come to pass.

The court finds that the dispute between the parties presents a sufficiently live case or controversy such that it would be inappropriate to postpone resolution of their dispute, and that harm to Soscia could result in the absence of judicial review. Regardless of whether Soscia applies for a permit, the Department issued a Notice of Violation to Soscia in August 2023 assessing $23,000 in civil penalties for failure to comply with the requirements of the Permitting Act. Although enforcement of the Notice of Violation has been temporarily stayed by the court to preserve the status quo while the court resolves the parties' various motions, the Notice of Violation has

not been rescinded and remains in place. While Soscia may ultimately petition for administrative review of the civil penalty, see doc. no. 47 at 83, the court finds that the Notice of Violation represents a final decision of the Department such that review of Soscia's takings claim is appropriate at this time. See Pakdel v. City & Cnty. of San Francisco, 594 U.S. 474, 478-81 (2021). Accordingly, the court is satisfied that it has jurisdiction to determine whether Soscia has plausibly pleaded a takings claim in Count II of the fourth amended complaint.

      B.    Legal Principles Applicable to Takings Claims

To plausibly allege an unconstitutional taking, the plaintiff must make a threshold showing "that they possess a recognized property interest which may be protected by the Fifth Amendment." In re Fin. Oversight & Mgmt. Bd. for P.R., 54 F.4th 42, 58 n.18 (1st Cir. 2022) (quotation omitted). Assuming the plaintiff plausibly pleads a protected property interest, they must next show that they were deprived of that interest. See id. A taking may be physical or regulatory. Id. Determining whether a taking is physical or regulatory is "critical," because "it often determines the level of scrutiny that a challenged government action will receive." Me. Educ. Ass'n Benefits Tr. v. Cioppa, 695 F.3d 145, 153 (1st Cir. 2012).

Physical takings "are relatively rare, easily identified, and usually represent a greater affront to the individual's property rights." Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 324 (2002). "A physical taking occurs either when there is a condemnation or a physical appropriation of property." Fin. Oversight, 54 F.4th at 58 n.18 (quotation omitted). In the typical case, this

occurs when the government acquires property via eminent domain or when it physically occupies or takes possession of any portion of private property without acquiring title to it. Cedar Point Nursery v. Hassid, 594 U.S. 139, 147-48 (2021). "Physical takings challenges involve the straightforward application of per se rules, which means that when the government takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." Fin. Oversight, 54 F.4th at 58 n.18 (quotation omitted).

Unlike its physical takings cases, "the Supreme Court's regulatory takings jurisprudence has eschewed any bright-line formulations." Cioppa, 695 F.3d at 153. "A regulatory taking transpires when some significant restriction is placed upon an owner's use of his property for which justice and fairness require that compensation be given." Fin. Oversight, 54 F.4th at 58 n.18 (quotation omitted). Generally speaking, to determine whether a regulatory taking has occurred, courts use the framework set forth in Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978). See Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015 (1992). Under that framework, courts consider "(1) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; (2) the regulation's economic impact on the property owner; and (3) the character of the government action." Cioppa, 695 F.3d at 153. Courts bypass these factors, however, when a restriction on the use of property results in the physical occupation of property or deprives the property owner of all economically viable use of its land. See id. When

a restriction on use operates in either of these two manners, a regulatory taking has occurred, and the court need not consider the Penn Central factors. See id.

The court will first consider whether the fourth amended complaint sets forth facts plausibly stating entitlement to relief under a physical takings rubric, then consider whether it plausibly states a regulatory takings claim.

### C.    Soscia Has Not Adequately Alleged a Physical Takings Claim

Soscia contends that it has adequately pled a physical takings claim. In the fourth amended complaint, Soscia alleges "[t]hat in issuing the cease and desist order on July 13, 2022, the Immediate Compliance Order dated August 9, 2022, and the imposition of a $23,000.00 fine dated July 12, 2023, and by applying the regulations adopted by [the Department] to the [Dam] and Johnson's Pond, the Defendants did take Soscia's property rights which it purchased from Quidnick." Doc. no. 51 ¶ 53. Soscia claims that the defendants deprived Soscia of its "easement rights acquired by Soscia, water rights and franchise rights as granted to it pursuant to the enactments of the Rhode Island General Assembly." Id. ¶ 54. It further claims that the defendants "have interfered with Soscia's rights to control . . . the water levels in Johnson's Pond thereby taking its franchise rights in violation of the Takings Clause." Id. ¶ 55. In addition, Soscia claims that the defendants' actions are "preventing Soscia from creating dry land and which dry land could be used by Soscia to its economic or other advantage," which, according to the complaint, also violates the Takings Clause. Id. Soscia asserts in the

complaint that, if "require[d] . . . to keep its submerged land underwater," it will be "completely deprive[d] . . . of all economically beneficial use of its property." Id. ¶ 56.

>    1.    Soscia Has Not Adequately Alleged That It Has a Property
>           Interest That It Has Been Physically Deprived Of

In support of its contention that the fourth amended complaint adequately pleads a physical takings claim, Soscia primarily relies on an opinion of the United States Court of Appeals for the Federal Circuit: Casitas Municipal Water District v. United States, 543 F.3d 1276 (Fed. Cir. 2008) ("Casitas I"). There, the plaintiff contracted with the Federal Government with respect to an infrastructure project that would provide water from two rivers to Ventura County, California. See 543 F.3d at 1280-81. The contract provided that the plaintiff would have "the perpetual right to use all water that becomes available through the construction and operation of the Project." Id. at 1281-82. Several decades after the project's completion, the government required Casitas to construct a "fish ladder" at one of the project's dams in order to protect an endangered fish species and to divert water from the project to the fish ladder, which caused a permanent loss of water. See id. at 1282. The plaintiff brought suit alleging that the government's actions constituted a taking.

The government moved for partial summary judgment in the trial court with respect to the plaintiff's takings claim. See id. The government's motion was limited to a request for "the trial court to determine the appropriate takings standard to be applied," i.e., whether the plaintiff's claim should be analyzed as a physical taking or a regulatory taking. Id. The trial court granted the government's motion and held

28

that the regulatory takings standard applied rather than the per se physical takings standard. See id. at 1283. The plaintiff then appealed that ruling.

On appeal, the Federal Circuit began its analysis by noting that the government had conceded, for purposes of the appeal, that the plaintiff had a valid property right to the water diverted from the river. See id. at 1288. Proceeding from this assumption, the court held that the plaintiff's claim was appropriately analyzed as a physical taking, not a regulatory taking. See id. at 1294. The government action constituted a physical taking (again, assuming that the plaintiff had a property interest in the diverted water) because the government had "required [the] construction of the fish ladder" on the plaintiff's property and "commandeered" the plaintiff's water to be used for the government's own ends. Id.

Soscia acknowledges, however, that the Federal Circuit revisited its opinion in Casitas I in 2013. See Casitas Mun. Water Dist. v. United States, 708 F.3d 1340 (Fed. Cir. 2013) ("Casitas II"). After the Casitas I Court reversed the grant of summary judgment and remanded the case to the trial court, the trial court dismissed the plaintiff's takings claims on ripeness grounds. See Casitas II, 708 F.3d at 1347. The trial court's conclusion was based on "the scope of [the plaintiff's] property right." Id. The court found that California law did not give the plaintiff a protected property interest in the diverted water, but rather, only granted the plaintiff a right to the "beneficial use" of the water. Id. Accordingly, because the plaintiff had not demonstrated that the diversion of some amount of water from the river had interfered with the plaintiff's beneficial use of the water within the river,

the court held that the plaintiff's claim was not ripe. Id. Its claim would ripen, according to the trial court, "when its customers . . . receive less water" as a result of the diversion of water to the fish ladder. Id. at 1347-48 (quotation omitted).

Casitas II represents the plaintiff's appeal of that dismissal. See id. at 1348. On appeal, the Federal Circuit agreed with the trial court that "well-established California law" provided that "a party having a right to use a given amount of California surface water does not have a possessory property interest in the corpus or the molecules of the water itself," but rather had only the right to the beneficial use of the water. Id. at 1353-54. Because the Court of Appeals found that the plaintiff lacked a property interest in the diverted water, it agreed with the trial court that the plaintiff's takings claims was not ripe because the plaintiff could not show that the diversion of water to the fish ladder deprived the plaintiff of its ability to use the water in the river for its own purposes. See id. at 1360.

As this discussion makes clear, despite the holding of Casitas I that the plaintiff's claim in that case should be analyzed under the physical takings rubric, the holding in that case assumed without deciding what is always a threshold issue in any takings claim – whether the plaintiff had a protected property interest that is susceptible to being taken by the government. See Fin. Oversight, 54 F.4th at 58 n.18. Casitas I does not stand for the proposition that the plaintiff in that case had a protected property interest in the diverted water, nor does it support the notion that Soscia has a protected property interest in the water levels within Johnson's Pond subject to regulation under the Permitting Act. Indeed, it would not be

30

possible for <u>Casitas I</u> to stand for such a proposition, given that the property interests protected by the Takings Clause are not established by the Constitution itself, but rather "by reference to existing rules or understandings that stem from an independent source such as state law." Phillips v. Wash. Legal Found., 524 U.S. 156, 164 (1998) (quotation omitted).

     Soscia contends that "the franchise which Soscia holds gives it a property interest in all of the water used in connection with the Dam for the sole and exclusive beneficial use of the members of Quidnick which rights Soscia purchased." Doc. no. 63 at 36-37 n.1. However, the court has already determined that Soscia has failed to plausibly allege that it has such franchise. <u>See</u> supra, Pt. I.A. Soscia does not point to any other "independent source" that would give it a property interest in the right to control the water levels behind the Dam. <u>See</u> Doc. no. 63 at 36-37 & n.1; <u>see also</u> <u>id.</u> at 39 ("The Permitting Act and the Regulations have appropriated a vested property right which [the legislature] had previously granted to Quidnick . . . ."). Nor does the complaint set forth facts making it plausible that some other, independent source gave Soscia a property interest in the water level behind the Dam or with respect to Johnson's Pond. Indeed, the mortgage which Soscia granted to Quidnick upon acquisition of Johnson's Pond and the Dam expressly requires Soscia to maintain the water levels consistent with the Water Level Table set forth in the Coventry Lease. <u>See</u> doc. no. 32-2 at 5.

     For these reasons, Soscia has failed to allege that it has a protected property interest in the water level behind the Dam or at Johnson's Pond. To the extent

Soscia's takings claim is brought as a physical takings claim premised on this assumption, it therefore fails as a matter of law.

        2.    <u>Even If Soscia Had Plausibly Alleged the Existence of a Franchise Giving It the Right to Control the Water Level at Johnson's Pond, Soscia Has Not Adequately Alleged That a Physical Taking Occurred</u>

Even assuming that Soscia had demonstrated a protected property interest in the right to control the water level at Johnson's Pond, Soscia has not plausibly alleged that a physical taking occurred with respect to such a property interest. As noted, Soscia primarily relies on <u>Casitas I</u> for the proposition that a physical taking has occurred in this case. However, the <u>Casitas I</u> court found that a physical takings analysis applied to the plaintiff's claim in that case because the government required a physical occupation of the plaintiff's property and because the government physically took water and used it for the government's own purposes. By contrast, here the Permitting Act and its implementing regulations do not permit the government to physically occupy Soscia's property and do not require Soscia to give the government Soscia's property to achieve the government's own purposes. The Permitting Act requires the owners and operators of dams having certain storage capacities to apply for a permit "to raise or lower the water level behind the dam." R.I. Gen. Laws § 46-19.1-1. "[U]ntil such time as a permit is issued . . . the owner or operator shall operate the dam in a manner that is consistent with historic use as determined by the [Department.]" <u>Id.</u> Unlike the requirement that the <u>Casitas</u> plaintiff permit the construction of a fish ladder on its premises, the Permitting Act does not empower the government to order that dam

owners or operators construct additional fixtures on their dams or in any reservoirs created by such dams. And unlike in <u>Casitas</u>, the Permitting Act does not empower the government to seize the water in a reservoir created by a dam in order that the water may be used by the government for its own purposes. Nor does it empower the government to order that the dam or reservoir owner divert his water to a third-party in order that the third-party may use the water for himself.[10]

Soscia also contends that the United States Supreme Court's opinion in <u>Cedar Point</u> is analogous to the circumstances in this case. Soscia is incorrect. In <u>Cedar Point</u>, a state regulation required agricultural employers to permit union organizers onto their property for up to three hours per day, 120 days per year. 594 U.S. at 143. Because the regulation "grants union organizers a right to physically enter and occupy the growers' land," it constituted a physical taking. <u>Id.</u> at 149. The Court's opinion primarily stands for the proposition that, regardless of whether the union organizers ever actually entered the growers' land, the regulation's appropriation of the property owners' <u>right to exclude</u> the organizers constituted a physical taking. <u>Id.</u> The Court's holding was based on the right to exclude being "one of the most treasured rights of property ownership" and "one of the most

---

[10] This distinguishes the Permitting Act from the trio of Supreme Court water rights cases cited in Soscia's objection to defendants' motion to dismiss, which were also relied upon by the Federal Circuit in <u>Casitas I</u>. <u>See</u> <u>Int'l Paper Co. v. United States</u>, 282 U.S. 399 (1931); <u>United States v. Gerlach Live Stock Co.</u>, 339 U.S. 725 (1950); <u>Dugan v. Rank</u>, 372 U.S. 609 (1963); <u>see also</u> <u>Casitas I</u>, 543 F.3d at 1290 (explaining that, in each of these cases, the government caused water to be taken from the plaintiffs' property and put to the government's own uses or a third-party's uses for purportedly public ends).

essential sticks in the bundle of rights that are commonly characterized as property. Id. at 149-50 (quotation omitted).

Cedar Point is inapposite to the circumstances of this case. The Permitting Act does not arrogate to the State Soscia's right to exclude others from its property. The Permitting Act does not require that Soscia permit the occupation of its property. It simply requires that Soscia obtain a permit in order to raise or lower the water levels behind the Dam, and until it does so, to operate the Dam in a manner consistent with its historic use.

For these reasons, to the extent Soscia's takings claims is premised upon a physical takings theory, it would fail as a matter of law even if Soscia had plausibly alleged it possessed a property interest susceptible to being taken by the State.

      D.    <u>Soscia Has Not Adequately Alleged a Regulatory Takings Claim for the Total Deprivation of All Economically Viable Use of Its Property</u>

As noted, regulatory takings claims are ordinarily reviewed under the <u>Penn Central</u> factors. Courts have recognized, however, that a regulatory taking occurs when a restriction on the manner in which property may be used deprives the owner of "all economically beneficial or productive use" of the property. Lucas, 505 U.S. at 1015. A restriction on use denies all economically beneficial or productive use of property when it leaves the property "economically idle." Id. at 1019. Even a severe or substantial impairment of a property's economic use is not enough to bypass the <u>Penn Central</u> factors. See Holcim-NER, Inc. v. Town of Swampscott, 671 F. Supp. 3d 84, 93 (D. Mass. 2023).

Soscia argues that, even if it has not plausibly alleged a physical taking, it has plausibly alleged that the Permitting Act deprives Soscia of all economically beneficial use of its property. Specifically, Soscia claims that the Permitting Act does not allow Soscia to "un-submerge [its] submerged land"—i.e., to drain Johnson's Pond and create "dry land." Doc. no. 63 at 42; see also doc. no. 51 ¶ 55. Soscia alleges in the fourth amended complaint that, if it is unable to create "dry land," it will be "completely deprive[d] . . . of all economically beneficial use of its property." Doc. no. 51 ¶¶ 55-56.

The allegation that Johnson's Pond has no economic value unless the water within the pond can be drained is conclusory and farfetched. It is conclusory because it is divorced from any factual allegations that would tend to show what economically viable use the land could be put to if it were drained. Soscia does not allege, for example, that the submerged land under Johnson's pond could be developed for residential housing or that Soscia had plans to do so prior to the Permitting Act's enactment. What is more, despite contending that the Permitting Act deprives Soscia of all economically viable use of its land by preventing it from creating dry land, Soscia makes the bizarre and contradictory assertion that "Soscia need not determine [the] economic benefits" to which it could put such dry land "until the land becomes dry." Doc. no. 63 at 42. Soscia's apparent position is that it cannot put Johnson's Pond to any economically viable use unless and until it is permitted to drain the Pond, but also that it cannot determine whether draining the Pond provides for an economically viable use until the Pond has been drained.

35

Soscia's internally irreconcilable position need not be credited in a 12(b)(6) analysis. See Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996) (explaining that the 12(b)(6) standard, while deferential, does not require the court to accept every one of plaintiff's assertions "hook, line, and sinker"; "bald assertions [and] unsupportable conclusions . . . need not be credited").

Moreover, Soscia's position that Johnson's Pond has no economically viable use in its current form ignores (1) the 1846 Act's recognition that dams along the Pawtuxet River could be used to provide water to mills along the river, (2) the 1982 Act's recognition that dams along the river could be used to generate hydroelectric power, and (3) Quidnick's lease of the Pond to the Town of Coventry for recreational purposes, that lease being subsequently assigned to Soscia. While the Coventry Lease expires at the end of March 2024, Soscia itself is currently enjoying an economic benefit from Coventry's use of the Pond for recreational purposes. As such, any contention that Soscia will be deprived of all economically viable use of the Pond absent the ability to drain the Pond is not only conclusory and farfetched—it is contradicted by the documents Soscia attaches to its complaint. For these reasons, Soscia has failed to plausibly allege a regulatory takings claim for the total deprivation of economic value of its property.

E.    Soscia Has Not Adequately Alleged a Regulatory Takings Claim Under *Penn Central*

The defendants contend that Soscia has not plausibly pleaded a regulatory taking under the Penn Central factors. In response, Soscia argues that a "Penn

Central analysis is not appropriate in this case." Doc. no. 63 at 43. To the extent the court disagrees, Soscia contends that the court cannot dismiss a regulatory takings claim for failing to plausibly plead entitlement to relief under Penn Central. Soscia cites no authority for this proposition. Indeed, courts regularly dismiss regulatory takings claims for failure to state a claim under Penn Central. See, e.g., 74 Pinehurst LLC v. New York, 59 F.4th 557, 566-68 (2d Cir. 2023). Soscia does not develop an argument in opposition to the defendants' contention that the fourth amended complaint fails to state a claim under Penn Central. As such, Soscia has waived this argument. See Murphy v. Franklin Pierce L. Ctr., 882 F. Supp. 1176, 1182 (D.N.H. 1994); Collins v. Marina-Martinez, 894 F.2d 474, 481 n.9 (1st Cir. 1990).

Even if the court were to consider whether the complaint plausibly stated a claim to relief under Penn Central, the court would find that the complaint failed to do so. As noted, under Penn Central, courts consider "(1) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; (2) the regulation's economic impact on the property owner; and (3) the character of the government action." Cioppa, 695 F.3d at 153.

With respect to the first prong, "[c]ourts will only protect a claimant's reasonable expectations." Id. at 154 (quotation, emphasis, and brackets omitted). The fourth amended complaint fails to plausibly allege that the Permitting Act interferes with Soscia's reasonable investment-backed expectations. Despite Soscia's arguments to the contrary, Rhode Island has regulated the operation of

37

dams for over a century. See Connolly v. Pension Ben. Guar. Corp., 475 U.S. 211, 226 (1986) (finding no reasonable, investment-backed expectation where the property at interest had been the "object[] of legislative concern since long before the passage of [the challenged legislation]"). Moreover, at the time Soscia purchased Johnson's Pond from Quidnick, it was assigned the Coventry Lease which restricted Soscia's ability to raise or lower the water levels in the Pond as it sees fit. Additionally, Soscia granted Quidnick a mortgage which restricted Soscia's ability to raise or lower the Pond's water levels. Finally, the Permitting Act contemplates that Soscia may be granted a variance to raise or lower the water levels in Johnson's Pond in a manner that is inconsistent with historic use. In short, the fourth amended complaint fails to plausibly allege that Soscia had a reasonable, investment-backed expectation that it would never be subject to restrictions as to the water levels in Johnson's Pond.

With respect to the second Penn Central factor—the regulation's economic impact on the property owner—courts generally consider "the extent to which the [challenged] action 'impairs the value or [typical] use' of the property." Cioppa, 695 F.3d at 157 (quoting PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 83 (1980)). The fourth amended complaint alleges that the Permitting Act leaves Soscia's property valueless. As discussed above, however, this allegation is conclusory, unreasonable, and contradicted by the materials attached to the complaint. The fourth amended complaint does not otherwise plausibly allege facts that, if established, would show that the Permitting Act impairs the value of Soscia's

property. As such, the fourth amended complaint fails to plausibly allege that the Permitting Act has negatively impacted the economic value of Soscia's property.

With respect to the third Penn Central factor—the character of the government action—a taking is less likely to occur when the challenged action "arises from some public program adjusting the benefits and burdens of economic life to promote the common good." Penn Central, 438 U.S. at 124. The Permitting Act applies to all dams in Rhode Island that have "the capacity to store greater than one thousand four hundred (1,400) normal storage acre feet of water." R.I. Gen. Laws § 46-19.1-1. The Permitting Act's implementing regulations identify six dams in the State to which the Act applies, of which Soscia's Dam is but one. 250-RICR-130-10-1.3. The Permitting Act does not prevent dam owners or operators from operating their dams in a manner that is inconsistent with historic use; it merely provides that the Department must grant a permit in order to do so. The cost-benefit analysis the Department performed in promulgating the Act's implementing regulations identifies numerous benefits from the permitting process, such as the protection of wildlife, guarding against flooding, and reducing dam owners' liability. In short, Soscia has failed to plausibly allege facts suggesting that the Permitting Act is anything other than a public program adjusting benefits and burden among society in order to promote the common good.

For these reasons, even if the court were to consider any waived argument that the fourth amended complaint adequately alleges a takings claim under Penn Central, the court would find that the complaint has failed to plausibly allege such

a claim. Having found that the complaint does not adequately state a physical takings claim or a regulatory takings claim, the court grants defendants' motion to dismiss Count II.

III.    Soscia Has Failed to Adequately Allege a Procedural Due Process Claim

In Count III, Soscia alleges that defendants violated its procedural due process rights "in sending the letter dated July 11, 2022, and issuing the cease and desist order on July 13, 2022." Doc. no. 51 ¶ 61. These actions were in violation of Soscia's procedural due process rights, according to the complaint, because defendants "failed to give Soscia an opportunity to comment and/or hearing." Id. Soscia may only seek prospective relief on its due process claim. Defendants contend that, because the alleged due process violations occurred prior to promulgation of the Permitting Act's implementing regulations, any future enforcement of the Act "will be under a different regulatory regime" and Soscia "has not claimed that this process is deficient." Doc. no. 58 at 29-30. Soscia objects but does not develop an argument that the processes laid out in the Permitting Act's implementing regulations fail to provide sufficient due process.

Generally speaking, a plaintiff's prior harm "is an insufficient predicate for equitable relief . . . '[a]bsent a sufficient likelihood that he will again be wronged in a similar way.'" Am. Postal Workers Union v. Frank, 968 F.2d 1373, 1376 (1st Cir. 1992) (quoting Los Angeles v. Lyons, 461 U.S. 95, 111 (1983)). Even if the court were to find that Soscia plausibly alleged that the sending of the July 11, 2022 letter as well as the cease-and-desist order dated July 13, 2022 violated Soscia's

procedural due process rights, those letters were sent under a different enforcement regime. Soscia does not contest that the Permitting Act's implementing regulations set forth: procedures to apply for a permit; criteria that the Department will use to judge permit applications; the legal effect of the issuance of a permit; parameters under which the Department may modify, suspend, or revoke a permit; avenues for enforcement of the Permitting Act; and an avenue to appeal an adverse decision. See 250-RICR-130-10-1.8, .10, .11. None of these provisions was in place when Soscia received the complained-of letter and order in July of 2022. Thus, even if defendants' July 2022 actions violated Soscia's procedural due process rights, that would not entitle Soscia to injunctive relief with respect to future actions taken under an altogether different enforcement scheme. As such, Soscia has failed to plausibly allege a procedural due process claim upon which relief may be granted, and defendants are entitled to dismissal of Count III.

IV.    Soscia Has Failed to Adequately Allege an Equal Protection Claim

In Count IV, Soscia alleges that "[t]he actions of Defendants in controlling the water levels in Johnson's Pond" and "imposing fines" "violate the Equal Protection and Due Process Clause[s]." Doc. no. 51 ¶¶ 64-65. The complaint further alleges that defendants "acted with malice" in taking these actions because they "intentionally and willfully intended to apply [the Permitting Act] for the purpose of providing recreational rights to abutting land on Johnson's Pond without providing just compensation." Id. ¶ 66. Defendants construe Count IV as raising an equal protection claim and contend that Soscia has failed to set forth facts upon which

41

relief can be granted for an equal protection claim. In response, Soscia contends that the complaint plausibly alleges a "class of one" equal protection claim.

A "class of one" equal protection claim may be brought "even where the plaintiff does 'not allege membership in a class or group.'" Back Beach Neighbors Comm. v. Town of Rockport, 63 F.4th 126, 130 (1st Cir. 2023) (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam)). To state a class-of-one claim, the plaintiff must plausibly allege (1) that it has been intentionally treated differently from others similarly situated (2) without a rational basis for the differing treatment. Id. To plausibly allege that others are similarly situated, the plaintiff must "identify comparators who are similarly situated in all respects relevant to the challenged government action." Id. at 130-31 (quotation and brackets omitted). There must be "an extremely high degree of similarity" between the plaintiff and the identified comparators. Id. at 131 (quotation omitted). While an "exact correlation is not required," the plaintiff must allege facts which make it plausible to conclude "that the comparators have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison [useless]." Id. (quotation omitted).

In its objection to the motion to dismiss, Soscia contends that it "constitutes a class of one which consists of franchise owners to which the terms of the Permitting Act were applied for the purpose of regulating the levels within Johnson's Pond without providing just compensation for the deprivation of the franchise rights owned by Soscia." Doc. no. 63 at 47. Soscia claims that "other dams covered by the

Permitting Act were treated differently because the purpose of regulating those dams did not involve a failure to pay just compensation for conferring a benefit already granted as a property right through franchise." Id. According to Soscia, it "owned the only dam covered by the Permitting Act which was being regulated for the purpose of providing benefits to the State and abutters without the payment of just compensation." Id.

Soscia's argument is opaque. Although Soscia purports to argue that the complaint plausibly alleges a class-of-one equal protection claim, its argument in opposition to the motion to dismiss does not track the elements of such a claim. As best the court can tell, it appears that Soscia is arguing that the complaint plausibly alleges a class-of-one claim because, of the dams regulated under the Permitting Act, Soscia's dam is the only one that is owned by an entity with a franchise to control the water levels behind the dam free from any government interference.

As an initial matter, the court has already determined that the fourth amended complaint fails to plausibly allege that Soscia has a franchise, so to the extent Soscia's equal protection claim relies on such a premise, it fails as a matter of law. Second, and more fundamentally, Soscia does not argue that the other dam owners are similarly situated to Soscia. To the contrary, Soscia argues that it occupies a meaningfully different position than these other dam owners because it is the only one with a franchise. Absent some group of highly similar comparators, Soscia cannot state a class-of-one claim, and Soscia does not argue that it is similarly situated to any other entity.

For these reasons, the fourth amended complaint fails to state a plausible class-of-one equal protection claim. Defendants are therefore entitled to dismissal of Count IV.

V.    The Court Declines to Exercise Supplemental Jurisdiction Over Soscia's Remaining State Law Claims

Soscia brings claims against defendants under Rhode Island state law in Counts V and VI. Defendants move to dismiss these counts as well. The court has already determined that all of Soscia's federal claims, which were the basis for the court's subject-matter jurisdiction, should be dismissed. At this early stage in the litigation, the court declines to exercise supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(c). See Swartz v. Sylvester, 53 F.4th 693, 703 (1st Cir. 2022); Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998).

## CONCLUSION

The court grants defendants' motion to dismiss (doc. no. 57), with the exception that the court declines to exercise supplemental jurisdiction over Counts V and VI, which are dismissed without prejudice. Soscia's motions for injunctive relief (doc. nos. 48, 52, 56, 70) are denied as moot, as is Soscia's motion for a hearing on its most recent motion for injunctive relief (doc. no. 71).

With respect to the temporary status quo injunction issued on July 29, 2023 (doc. no. 54), Soscia is granted **thirty (30) days** from the date of this order to resolve the pending Notice of Violation and penalty without accruing additional

penalties or interest. When that time expires, defendants may take any appropriate steps to enforce the Notice of Violation.

The clerk of court shall enter judgment and close the case.

SO ORDERED

_____
Landya McCafferty
United States District Judge
Sitting by Designation

March 25, 2024

cc:     Counsel of Record